

FILED

APR - 5 2010

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| IN RE: | Case No.: 09-29162- D-11 |
| | |
| SK FOODS, L.P., A CALIFORNIA LIMITED PARTNERSHIP, | FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PRELIMINARY INJUNCTION |
| | |
| Debtor. | DATE: March 18, 2010<br>TIME: 1:30 p.m.<br>DEPT: D (Courtroom 34) |
| | |
| BRADLEY D. SHARP, et al., | |
| Paintiff, | |
| v. | Adv. Pro. No. 09-2692-D<br>Docket Control No. SH-1 |
| SSC FARMS I, LLC, et al., | |
| Defendants. | |
| | |
| BRADLEY D. SHARP, et al., | |
| Paintiff, | |
| v. | Adv. Pro. No. 10-2014-D<br>Docket Control No. SH-1 |
| SCOTT SALYER, as trustee of the Scott Salyer Revocable Trust, et al., | |
| Defendants. | |
| | |
| BRADLEY D. SHARP, et al., | |
| Paintiff, | |
| v. | Adv. Pro. No. 10-2016-D<br>Docket Control No. SH-1 |
| SKF AVIATION, LLC, et al., | |
| Defendants. | |

1

On the 18th day of March 2010, this Court considered the Motion of Bradley D. Sharp, Chapter 11 Trustee of SK Foods, LP for a preliminary injunction in the above-referenced actions. The Court considered the submissions and declarations in support of that Motion, and the Opposition and submissions of the Defendants in response to that Motion. The Court also took live testimony, afforded the parties the opportunity to cross-examine witnesses and heard oral argument by counsel for the parties. After affording the parties the foregoing hearing, and good cause having been shown, the Court granted the Trustee's motion and entered a Preliminary Injunction, which was filed on March 20, 2010 in each of the above-referenced actions. The Court makes the following findings of fact and conclusions of law in connection with its decision to enter the foregoing Preliminary Injunction.

## FINDINGS OF FACT

Procedural History

1.     Trustee Bradley D. Sharp ("Trustee") is the duly appointed and acting Chapter 11 trustee for the Chapter 11 estates of SK Foods, L.P., a California limited partnership ("SK Foods"), and RHM Industrial/Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co. ("RHM", collectively with SK Foods, the "Debtors").

2.     On or about May 7, 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (the "Bankruptcy Code."). Involuntary petitions were filed with respect to the Debtors on or about May 5, 2009 ("Petition Date").

3.     On October 27, 2009, the Trustee filed adversary proceeding No. 09-02962 against Defendants SSC Farming, LLC ("SSC"), SSC Farms I, LLC ("SSC I"), SSC Farms II, LLC ("SSC II") (hereinafter "Quiet Title Complaint"). In that Complaint, the Trustee sought declaratory relief and to quiet title to certain parcels of real estate which were titled in the name of the Defendants, but for which Debtors claimed an equitable interest.

4.     On January 11, 2010, the Trustee filed adversary proceeding No. 10-02014 against SK PM Corp., SK Foods, LLC, SKF Canning, LLC, the Scott Salyer Revocable Trust ("SSR Trust"), Blackstone Ranch Corporation ("Blackstone"), Monterey Peninsula Farms, LLC ("Monterey"), Salyer Management Company, LLC ("SMC"), SK Farms Services, LLC, SK Frozen Foods, LLC, SS Farms, LLC ("SS Farms"), SSC, SSC I, SSC II, and SSC Farms III, LLC ("SSC III") (hereinafter the "Substantive Consolidation Complaint").  In that Complaint, the Trustee sought to substantively consolidate the assets and liabilities of the Defendants with the Debtors' Estates, and also sought to recover various fraudulent and/or preferential transfers against each of the Defendants.

5.     On January 11, 2010, the Trustee filed adversary proceeding No. 10-02016 against SKF Aviation, LLC and CSSS, LP d/b/a Central Valley Shippers ("CSSS") (hereinafter the "Aviation Complaint").  In that Complaint, the Trustee sought recovery of certain fraudulent and/or preferential transfers to each of the Defendants.

6.     Also on January 11, 2010, the Trustee filed another adversary proceeding at docket number 10-02015 against Scott Salyer ("Salyer"), SK PM Corp and the SSR Trust (hereinafter "Breach of Fiduciary Duty complaint").  In that Complaint, the Trustee sought money damages against the Defendants for breaches of fiduciary duties and breaches of the partnership agreement of SK Foods, L.P.

7.     Subsequent to the filing of these complaints, the Trustee and the Defendants participated in settlement negotiations with the Honorable Michael McManus, pursuant to order of this Court (Adv. No. 10-2014 at Doc. No. 8).

8.     On February 4, 2010, Salyer was arrested and charged with various crimes including bribery, wire fraud and mail fraud.  In the context of several hearings over whether Mr. Salyer should be granted bail, certain records obtained by the government were made public for the first time.  The disclosure of these records triggered the motions that are the subject of these Findings.

3

9.     On March 9, 2010, the Trustee filed ex parte motion for a Temporary Restraining order and a Rule to Show Cause Why a Preliminary injunction should not be granted in four separate adversary proceedings:  the Quiet Title action, the Substantive Consolidation action, the Aviation action and the Breach of Fiduciary action.  The Trustee sought expedited relief on the grounds that Defendants were transferring their assets overseas and that these activities would compromise the Trustee's remedies in these adversary proceedings.

10.     Notice of the Trustee's intent to file these motions was provided to Defendants' counsel in open court on March 8, 2010.  The basis for the requested relief was also disclosed at that time.  At that time, the Court advised counsel that it would hear the application on March 11, 2010.

11.     On March 9, 2010, the Trustee filed its motions in each of the four adversary proceedings and served Defendants' counsel with its moving papers by email.  .

12.     The Trustee's motions were supported by the following pleadings and evidence: the Declarations of Shondale Seymour (hereinafter "March 8, 2010 Declaration of Shondale Seymour"); Christopher Hart, Gregory C. Nuti filed with the motion, previous Declarations filed of record by Dan Kline (on August 19, 2009 (Doc. No. 612) in No. 09-29162), Shondale Seymour (on June 9 (Doc. No. 206) and August 18 (Doc. No. 613), 2009 in No. 09-29162), Lisa Crist (on May 8 (Doc. No. 33) and August 19 (Doc. No. 613), 2009 in No. 09-29162) and Paul Forgue (on May 8, 2009 (Doc. No. 56) in No. 09-29162), and a Request for Judicial Notice of the filings in the criminal proceeding against Mr. Salyer.  (*See* Notice of Ex Parte Motion for a Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction at 5:22-26).

13.     On the evening of March 10, 2010, Defendants collectively filed an Opposition to the Ex Parte Applications.

14.     At the hearing on March 11, 2010, all Defendants appeared through counsel.

15.     At the conclusion of the hearing, the Court granted a Temporary Restraining Order in the Quiet Title action, the Substantive Consolidation Action and the Aviation action,

and issued an Order to Show Cause returnable on March 18, 2010 at 1:30 pm as to why a Preliminary Injunction should not be issued.

16.    Prior to the March 18, 2010 hearing, the Trustee submitted additional pleadings and evidence.  The Declaration of Keith Whitson attached a memorandum of sale of certain real estate property owned by SSC, transcripts of two bail hearings for Mr. Salyer and a submission made by Mr. Salyer in his criminal action.  The Declaration of Michael Carlson attached subpoenas that the Trustee had issued on the Defendants to produce records at the hearing, and subpoenas issued on Bank of the West, Mechanics' Bank and Google.  Declarations of custodians of records for Bank of the West and Mechanics' Bank were also filed.

17.    Prior to the March 18, 2010 hearing, the Defendants filed objections to the Trustee's evidence, a further brief in Opposition and excerpts from a deposition of Shondale Seymour and a transcript of the deposition of Wayne Boos.

18.    During the March 18, 2010 hearing, the Trustee presented live testimony by Shondale Seymour, and the Defendants had the opportunity to cross-examine her both on that testimony and on the contents of the declaration she had submitted.  At Defendants' request, the Trustee also produced Lisa Crist (whose declaration was also referenced in the moving papers) for cross-examination at the request of Defendants, but at the hearing, the Defendants declined the opportunity to cross-examine her.  Defendants had also requested that FBI Agent Artley be made available for cross-examination at the March 18, 2010 hearing.  Mr. Artley was not at the March 18, 2010 hearing.  Before the hearing, the Trustee offered to make Paul Forgue and Dan Kline available for cross-examination; the Defendants did not request that either of them be present.

19.    Before the hearing, the Trustee had requested that Defendants make Wayne Boos available for cross-examination at the hearing.  Mr. Boos was not at the March 18, 2010 hearing.

20.    After considering the submissions of the parties, the evidence and arguments presented at the March 18, 2010 hearing, and having ruled on the party's objection to evidence as

more fully set forth below, the Court finds the Trustee is likely to succeed on the merits, and makes the following findings.

Facts Relating to the Defendants Transferring Assets

21.    In the context of a related adversary proceeding (Bradley D. Sharp v. CSSS, LP, Adv. No. 09-2543, hereinafter the "Drum-Line Litigation"), this Court issued a temporary restraining order on August 24, 2009 prohibiting CSSS, LP ("CSSS") from selling, transferring or encumbering the drum line.  On September 3, 2009, the Court issued a preliminary injunction continuing the restraints and injunctions imposed in the August 24, 2009 Order (Docket Number 34 in Adv. No. 09-2543).

22.    Notwithstanding the existence of this Court's orders to the contrary, the drum line was shipped overseas on or about August 31, 2009 (Doc. No. 73, Exhibit B, at Adv. No. 09-2543).

23.    The drum line is one of many assets purportedly owned by Defendants but which the trustee alleges relate to the Debtor's business and in which the Debtor has claimed an interest.  (*See* Complaint in Adv. No. 09-2543.)

24.    The Trustee alleges that Salyer and the Farming Entities (SSC, SSC I and SSC II) are attempting to sell real estate ("Wastewater properties") in which the Debtor's Estate  claims an interest.  The Farming Entities previously successfully objected to *lis pendens* on those properties.  In September 2009 the Farming Entities entered into sale agreements with respect to certain of these properties.  *See* Declaration of Christopher Hart, Exhibit 1; Declaration of Keith Whitson, Exhibit 1.

25.    The Debtor's Estate claims an equitable interest in the property held by the Farming Entities (*See* Quiet Title Complaint).

26.    In addition, the Trustee alleges the Defendants have taken steps to transfer or sell other assets that are either alleged to be assets of the Estate or are the subject of preference/avoidance actions.  Salyer was recently arrested on a number of different charges,

including alleged violations of the Racketeer Influenced and Corrupt Organizations Act and mail and wire fraud. In that criminal matter, the government filed a Motion seeking Salyer's Pretrial Detention and filed dozens of exhibits in support of that motion (Request for Judicial Notice, Exhibits 1-3).

27.    Based on the allegations in the criminal proceeding, the Trustee alleges that Defendants have been transferring large sums of money from accounts in the name of the Defendants to bank accounts in Liechtenstein, the West Indies and Australia, among other places. The government apparently argued in the criminal matter that these transfers evidence an intent to flee the country. *See* Declaration of Keith Whitson, Exhibits 2, 3 and 4 (Doc. No. 28)

28.    The Trustee submitted declarations from the custodians of records of Bank of the West and Mechanics' Bank that authenticate and describe certain bank records evidencing large transfers of money from the Defendants' accounts to other bank accounts, including overseas accounts. Declaration of Patrick Salcido, Bank of the West (Doc. No. 39) (Exhibit W); Declaration of Annette Bartlett, Mechanics' Bank (Doc. No. 40) (Exhibits JJ, KK and LL). Those bank records reference the following transactions, among others:

| Date | From | To | Amount | Source |
|------|------|----|--------|--------|
| 4/16/09 | SS Farms (Bank of the West) | SS Farms II, LLC (Mechanic's Bank) | $1,500,000 | Exhibit X |
| 6/30/09 | Mechanic's Bank | First Republic Bank, San Francisco | $1,000,000 | Exhibit KK |
| 9/4/09 | Mechanic's Bank | Volksbank Liechtenstein and Fast Falcon, LLC in Charleston, Nevis West Indies | $250,000 | Exhibit LL |
| 9/10/09 | Mechanic's Bank | Volksbank Liechtenstein and Fast Falcon, LLC in Charleston, Nevis West Indies | $250,000 | Exhibit LL |
| 9/11/09 | Mechanic's Bank | Volksbank Liechtenstein and | $250,000 | Exhibit LL, HH, II |

7

| | | Fast Falcon, LLC in Charleston, Nevis West Indies | | |
|---|---|---|---|---|
| 9/14/09 | Mechanic's Bank | Volksbank Liechtenstein and Fast Falcon, LLC in Charleston, Nevis West Indies | $2,750,000 | Exhibit LL, HH, II |
| 9/17/09 | SK PM Corp (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $27,375.44 | Exhibit W (SSD 00214) |
| 9/17/09 | SK Foods, LLC (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $17,911.47 | Exhibit W (SSD 00215) |
| 9/17/09 | SARS, LLC (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $35,459.17 | Exhibit W (SSD 00216) |
| 9/17/09 | CSSS, LP (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $25,054.27 | Exhibit W (SSD 00217) |
| 9/17/09 | CSSS, LP (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $10,201.20 | Exhibit W (SSD 00218) |
| 9/17/09 | SS Farms, LLC (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $9,043.83 | Exhibit W (SSD 00219) |
| 9/17/09 | SS Farms, LLC (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $32,895.92 | Exhibit W (SSD 00220) |
| 9/17/09 | SSC Farming, LLC (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $4,934.49 | Exhibit W (SSD 00221) |
| 9/17/09 | SSC Farming, LLC (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $20,529.18 | Exhibit W (SSD 00222) |
| 9/17/09 | SSC Farms I, LLC (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $83.47 | Exhibit W (SSD 00223) |
| 9/17/09 | SSC Farms II, LLC (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $69.47 | Exhibit W (SSD 00224) |
| 9/17/09 | SSC Farms III, LLC (Bank of the West) | SSC Farms II, LLC (Mechanic's Bank) | $33,712.04 | Exhibit W (SSD 00225) |
| 9/28/09 | SSC Farms II, LLC (Mechanic's Bank) | First Republic Bank, San Francisco | $100,000 | Exhibit KK |
| 9/30/09 | SSC Farms II, | First Republic Bank, | $100,000 | Exhibit KK |

| | | LLC (Mechanic's Bank) | San Francisco | | |
|---|---|---|---|---|---|
| 10/13/09 | Mechanic's Bank | Volksbank Liechtenstein and Fast Falcon, LLC in Charleston, Nevis West Indies | $250,000 | Exhibit LL |
| 11/10/09 | Scott Salyer Revocable Trust (Mechanic's Bank) | Westpac Bank (Australia) | $303,837.03 | Exhibit KK |
| 11/12/09 | Scott Salyer Revocable Trust (Mechanic's Bank) | Westpac Bank (Australia) | $508,808.47 | Exhibit KK |

29.     The Trustee also provided the Court with a number of documents from the criminal proceeding against Scott Salyer that purport to be emails from the email accounts of Defendant Scott Salyer (see Request for Judicial Notice at Exhibits F, I, J, K, P, R, S, X, Y, Z, AA, BB, CC, DD, GG, HH, II, NN, OO, PP, and RR).  The Trustee alleges these documents also describe the Defendants' attempts to transfer funds to overseas accounts, and are consistent with the bank records.

30.     The Trustee served subpoenas on the custodian of records of each of the Defendants requiring them to bring to the Preliminary Injunction hearing on March 18, 2010, copies of all the bank records and emails submitted by the Trustee, as well as other documents concerning the transfer of funds or other assets (Declaration of Michael Carlson (Doc. No. 38)). The Defendants objected to the subpoenas and did not produce the responsive documents at the hearing.

31.     The Trustee also produced other documents in which the Trustee asserts Defendants admitted that they had been transferring assets overseas (Declaration of Keith Whitson, Exhibits 2, 3 and 4 (Doc. No. 28)).  In particular, at a February 26, 2010 hearing addressing Mr. Salyer's request for bail, the following colloquy occurred between the Court and Mr. Segal, counsel to Mr. Salyer:

> THE COURT: . . . Why the movement of all of these wire transfers to the bank in Zurich?

MR. SEGAL: In the first case, as we explained in our moving papers, $1.2 million of the monies that were moved to – overseas to a corporation which was managed by the trust was the result of the settlement of a dispute between the trustee in bankruptcy for SK Foods, Bradley Sharp, and the daughters' estate. . . . (p. 24, line 20 to p. 25, line 2)

The farming enterprises which had relied upon its business dealings with SK Foods were suffering financially and could not meet the requirements of planting crops and hiring employees, so those farming entities were faltering. So the best opportunity for the girls, the trust for the girls to be successful in the future, as to find places to invest the money other than in the properties and the businesses which were going under in the United States.

There were two excellent places to use that money. One excellent place to use that money was in Australia and New Zealand. . . .(p. 26, lines 11 through 21).

THE COURT: Why wouldn't that be wired to Australia or New Zealand? Why would it be wired to a Swiss bank?

MR. SEGAL: Because it was – because that's where the central account was located for the trust. . . .(p. 27, lines 7 to 10)

The same thing was happening with the deposits made in the account in Switzerland. It had intended to be used to shore up Cedenco and for business expenses. And the credit card on that account was being used by Mr. Salyer for his travel expenses with the permission of the estate to try to find other business opportunities in Europe, because as the letters received say, and the letters are very clear about it from individuals who know them, Mr. Salyer could not find business opportunities in the United States. It was essentially he was being hounded by the lenders, and because his reputation had suffered because of this investigation.

So, what he did was he was looking for business opportunities in Europe as well as trying to shore up Cedenco in Australia. Those business opportunities were all over Europe, and so he was looking for a centralized banking location. . . . (p. 28, lines 8 through 23)

He was trying to buy shares in Inventco and he was looking for other business opportunities. He needed fund from those accounts to do that, and funds from those accounts were actually used. . . . (p. 29, lines 8 through 10)

And so he was using that money that was in that account to try to promote business interests. . . . (p. 29, line 24 to p. 30, line 1)

32.    Similarly, at a March 3, 2010 hearing, Mr. Segal made the following statement to the Court:

MR. SEGAL:  . . . The government has shown through documents that he took from open emails that Mr. Salyer had caused some money to be accumulated from various corporations, and sent overseas. (p. 16, lines 15 through 17)

So I would indicate to the Court that I do not think that money overseas is indicia of anything other than the fact that it's there and that doesn't indicate that the defendant has a right to it or that he'll make claim to it or that he'll use it for some nefarious purpose. (p. 22, lines 1 through 5).

33.    Finally, in a submission to the Court in the criminal matter, Mr. Salyer stated as follows:

While there are accounts overseas, they have been used for business purposes and much of those deposited funds belong to Mr. Salyer's daughters from a court-approved settlement with the bankruptcy Trustee and from tax refunds generated by the businesses. . . . No money was hidden overseas, the funds were transferred overseas through normal banking channels and any funds presently in foreign bank accounts can be ordered transferred to banks in the United States. (pg. 6, line 20 to page 7, line 1). *See also* page 27, lines 1 through 5.

34.    The Defendants did not present any evidence at the hearing to counter the evidence submitted, and assertions made, by the Trustee.

Facts Relating to the Claims Made in the Adversary Proceedings

11

35.    The Court finds that the testimony of Shondale Seymour both during the Preliminary Injunction hearing and in her declarations was responsive, candid, and credible (Transcript of March 18 hearing).

36.    Although Ms. Seymour's March 8, 2010 Declaration does not, in and of itself, provide sufficient foundation for all of the statements in her declaration, her testimony during direct examination provided further evidence regarding the sources and extent of her personal knowledge, and the Court finds that she has personal knowledge of, and is competent to testify to, the statements set forth in her declarations and in her live testimony (Transcript of March 18 hearing).

37.    The various Salyer-owned entities have been collectively referred to as "Salyer Enterprises" or "SK Foods Group". *See* October 16, 2009 Memorandum Decision, p. 2 (Doc. No. 865 in No. 09-29162); August 19, 2009 Declaration of Dan Kline, ¶5 (Doc. No. 612 in No. 09-29162), and September 15, 2009 Declaration of Donald Putterman, ¶3 (Doc. No. 727 in No. 09-29162).

38.    The number of related entities and their similar sounding names appear to have at times caused confusion to all concerned.   October 16, 2009 Memorandum Decision, p. 2, n.2 (Doc. No. 865 in No. 09-29162).

39.    Debtor is owned, directly and indirectly, by the Scott Salyer Revocable Trust and two other trusts set up for Mr. Salyer's daughters. *See* May 8, 2009 Declaration of Lisa Crist, ¶18 (Doc. No. 33 in No. 09-29162).

40.    The Trustee alleges these same entities ultimately owned and controlled all of the other Defendants.  August 19, 2009 Declaration of Shondale Seymour, ¶7, Exhibit 2 (Doc. No. 613 in No. 09-29162) and March 8, 2010 Declaration of Shondale Seymour, ¶¶4, 5, Exhibit 1. For example, as demonstrated by the Salyer Enterprises flowchart of related entities, Blackstone Ranch Corp ("BSR") is owned 100% by the Scott Salyer Revocable Trust ("SSR Trust"). Similarly, the SSR Trust owns 60% of SS Farms and SSC (the Stephanie Ann Salyer Trust ("SAS Trust") and the Caroline Gazelle Salyer Trust ("CGS Trust") each own 20% as well).

12

SSC I and II are each owned 50% by the SSR Trust and 50% by the SAS Trust (Id.). *See* March 8, 2010 Declaration of Shondale Seymour, ¶4, Exhibit 1.

41.     Exhibit 1 to Ms. Seymour's Declaration is a one-page flow chart that identifies the web of relationships between the various entities, and demonstrates that the Defendants are owned, directly or indirectly, by Mr. Salyer, his daughters, or trusts set up in their names. *Id.*, ¶5.

42.     Salyer also controlled each of these entities as the Manager, Officer, Director, Sole Shareholder or Trustee of each entity. *Id.*, ¶6.

43.     Together, these various entities grew, harvested, processed and readied for shipment tomatoes and other crops. SSC, SSC I and SSC II grew the tomatoes and held title to the land. SSF would harvest the tomatoes and provided farming services to SSC, SSC I and SSC II. SSF then would provide the vegetables to SK Foods or RHM for processing. March 8, 2010 Declaration of Shondale Seymour, ¶7. As part of the processing, SK Foods/RHM would discharge wastewater on the land owned by SSC, SSC I and SSC II. *Id.*

44.     To process the tomatoes, SK Foods used 10,000 wood bins, which are owned by the SSR Trust. It also used a computer system that is owned and/or leased by Salyer American Fresh Foods ("SAFF"). SK Foods also used fiber drums that are supplied by CSSS and engaged CSSS to load the tomatoes onto a rail line for shipment. March 8, 2010 Declaration of Shondale Seymour, ¶¶7-8.

45.     Each of these related entities, at least in theory, had a distinct role in this process, but from a financial perspective, each entity was dependent upon the other entities for their survival. *Id.*, ¶9-22. *See also* Declaration of Donald J. Putterman in Support of Opposition to Motion to Disqualify Kasowitz, ¶7 (Doc. No. 782 in No. 09-29162) ("Most but not all of the entities included with Salyer Enterprises were involved with tomato growing, harvesting, processing and/or sales, and also the growing, harvesting, marketing and sales of other vegetables and vegetable products.").

46.     The Trustee contends Defendants had little to no operations outside of its relationship with the Debtor.  For example, SSC I and SSC II relied on two sources of revenue, each of which came from SK Foods.  Similarly, almost all of SSC Farming's crops were sold to SK Foods, and ninety percent of the crops harvested by SS Farms were processed by SK Foods.  Other Defendants similarly had no independent operations.  March 8, 2010 Declaration of Shondale Seymour, ¶¶23-30.

47.     Similarly, the Trustee alleges the Defendants were never capitalized or operated for profit.  *Id.*, ¶¶31-37.

48.     The Trustee alleges the Debtor and the Affiliated Entities did not deal with each other at arm's length.

49.     Money was transferred back and forth between the Defendants when an Affiliate needed money, not necessarily when it was due under a contract or when the Affiliate provided some goods or services to the Debtors.  *Id.*, ¶¶51-59.

50.     Payment of inter-company obligations was frequently deferred and 'caught-up' at various intervals, often at the end of a tax year.  June 9, 2009 Declaration of Shondale Seymour, ¶7, 13 (Doc. No. 206 in No. 09-29162).  This pattern included payment for the right to discharge wastewater on land purportedly owned by the Farming Entities.  *Id.*, ¶8; *See also* March 8, 2010 Declaration of Shondale Seymour, ¶¶52.

51.     The pricing of products or services provided by one entity to another was not generally negotiated, but rather, was set by Salyer who controlled both parties.  In some instances, Salyer retroactively reset prices charged to SK Foods by the Defendants.  March 8, 2010 Declaration of Shondale Seymour, ¶¶ 54-55.  For example, near the end of 2008, when SSC III and SSF were losing money, Salyer unilaterally changed the terms of the contracts so that SK Foods was charged additional amounts.  *Id.*, ¶55.

52.     Indeed, in many instances, the related companies did not have any written contracts with each other.  For instance, although CSSS provided the fiber drums and rail trans-loading for SK Foods, there was no contract describing the terms of this relationship.  Similarly,

there was no contract with SAFF for the use of the computer system.  March 8, 2010 Declaration of Shondale Seymour, ¶38.

53.    Records of the various entities were stored and maintained together.  Paper records of the various entities were stored at SK Foods' places of business or in storage units under SK Foods' control.  *See* August 19, 2009 Declaration of Shondale Seymour, ¶4 (Doc. No. 613).

54.    The Affiliated Entities' electronic documents were stored on computer systems owned and maintained by SK Foods.  August 19, 2009 Declaration of Dan Kline, ¶10-14 (Doc. No. 612).  For instance, electronic documents related to insurance were maintained in a folder on the public drive entitled "Admin/Insurance."  Similarly, electronic documents related to human relations activities were stored on the same public drive under the folder "Admin/HR".  Financial records from year 2007 and beyond for many of the Defendants were similarly stored in a folder entitled "2007 Monthly Closings."  Again, documents relating to numerous Defendants, including SK Foods, were contained within this folder.  *See* August 19, 2009 Declaration of Dan Kline, ¶15 (Doc. No. 612).

55.    All Defendants used the SK Foods email addresses and the SK Foods.com domain name.  August 19, 2009 Declaration of Shondale Seymour, ¶4 (Doc. No. 613 in No. 09-29162); August 19, 2009 Declaration of Lisa Crist, ¶13 (Doc. No. 614 in No. 09-29162).

56.    Some of SK Foods employees had access to all of these records.  August 19, 2009 Declaration of Dan Kline, ¶7, 8 (Doc. No. 612 in No. 09-29162).  SK Foods employees also regularly accessed these records for the benefit of, and at the specific request of, the Defendants.  August 19, 2009 Declaration of Lisa Crist, ¶14 (Doc. No. 614 in No. 09-29162).

57.    The Debtors and some or all of the Affiliated Entities shared management.  Shondale Seymour served as CFO of Debtor and of various Affiliated Entities, including Blackstone, SS Farms and SSC. June 9, 2009 Declaration of Shondale Seymour, ¶1 (Doc. No. 206 in No. 09-29162).  Lisa Crist was Executive Vice President of Administration of the Debtors and various Affiliated Entities. May 8, 2009 Declaration of Lisa Crist, ¶1, 3 (Doc. No. 33 in No.

09-29162).  Steve King, SK Foods' former Vice President of Operations also provided senior management oversight for CSSS and for certain activities of SSC, SSC I and SSC II.  Richard Emmett, SK Foods' former Vice President of Ag Operations, also provided senior management oversight for SS Farms, SSC, SSC I and SSC II.  August 19, 2009 Declaration of Lisa Crist, ¶4 (Doc. No. 614 in No. 09-29162).  Jeanne Johnston was responsible for business development matters for the SK Foods Group in its entirety, including marketing materials and also served as Mr. Salyer's executive assistant for all matters relating to the Salyer family's entities.  September 15, 2009 Declaration of Donald Putterman, ¶5 (Doc. No. 727 in No. 09-29162).

58.    Most management were paid by the Debtors, even though they performed services for other entities.  August 19, 2009 Declaration of Lisa Crist, ¶4 (Doc. No. 614 in No. 09-29162); *see also* March 8, 2010 Declaration of Shondale Seymour, ¶¶39-50.

59.    Individuals in Debtor's accounting department performed accounting functions for many of the Defendants.  June 9, 2009 Declaration of Shondale Seymour, ¶2 (Doc. No. 206 in No. 09-29162).  This included accounting functions related to the Farming Entities' real estate.  *Id.*, ¶4.

60.    SK Foods' IT department performed IT functions for the Affiliated Entities.  August 19, 2009 Declaration of Dan Kline, ¶7, 8 (Doc. No. 612 in No. 09-29162).

61.    As of January 2009, with the exception of one administrative staff and a few farm hands, all other administrative and operations support for the Farming Entities were provided for and paid for by SK Foods. August 19, 2009 Declaration of Shondale Seymour, ¶8 (Doc. No. 613 in No. 09-29162).  These functions included human resources, administration, IS/IT functions and accounting.  *Id.*

62.    The Trustee alleges the Debtors made payments on invoices for liabilities incurred by other related entities, reimbursed related entities for costs spent on tenant improvements at the headquarters locations in Monterey, and provided funding to certain related entities to repay intercompany liability of other related entities with limited apparent benefit to the Debtors.  May 11, 2009 Declaration of Paul Forgue, ¶ 7 (Doc. No. 56 in No. 09-29162).

63.     Historically, there has been a significant number of related party transactions in which funds were diverted from the Debtors to Defendants without an adequate explanation. May 11, 2009 Declaration of Paul Forgue, ¶17 (Doc. No. 56 in No. 09-29162). As of January 31, 2009, five different Affiliates owed SK Foods approximately $10 million. *Id.* After February 28, 2008, an additional $6 million flowed between the Debtors and Defendants. *Id.*

64.     There are numerous examples of other intercompany transfers for no apparent or documented reason spanning many years up to and including 2009. For example, in December 2006, $4 million from SK Foods was used to allow two other related entities, RHM and SK Aviation to make tax prepayments (March 8, 2010 Declaration of Shondale Seymour, ¶74). Similarly, in April 2009, Salyer withdrew $1.7 million from SS Farms and deposited those funds into his personal account. He represented that he was using those funds to pay down a note on which SSC was an obligor, and that by paying off this note, the SSC land could be used as collateral for a separate loan to another Salyer entity, SAFF (March 8, 2010 Declaration of Shondale Seymour, ¶¶58). Ms. Seymour presented many other examples of unexplained intercompany transfers with no apparent consideration. *See* March 8, 2010 Declaration of Shondale Seymour, ¶¶ 68-83.

65.     SK Foods itself attempted to reconcile these various intercompany transactions when various lenders started questioning the practices. Despite this attempt to track all such transactions and the underlying reasons for such transactions, SK Foods ultimately did not determine the purposes for all the transactions or reconcile the books. (March 8, 2010 Declaration of Shondale Seymour, ¶ 86 and live testimony on March 18, 2010.)

66.     Management was not able to determine the purposes of various transactions because there was often no backup for the transfers. For instance, when checks were used, generally there were no check requests or other documentation. When wire transfers were used, amounts transferred were rounded up, again without backup. An effort was made to keep copies of the supporting vendor payables that were being funded, but this was not until mid to late 2007. However, for some transfers, there was no documentation except that the Defendant's bank

account was near zero and funds were needed to cover outstanding obligations, including payroll.  (March 8, 2010 Declaration of Shondale Seymour, ¶ 87 and live testimony)

67.    In sum, even when money could be followed from one entity to another, often the underlying purposes of the transactions could not be determined and substantiated.  (March 8, 2010 Declaration of Shondale Seymour, ¶ 88 and live testimony on March 18, 2010.)

68.    At the end of February 2008, Debtor and some, or all, of the Affiliated Defendants transferred funds among each other in an effort to balance the intercompany transfers, despite a lack of understanding for the purposes of the transactions.  (March 8, 2010 Declaration of Shondale Seymour, ¶ 89 and live testimony on March 18, 2010.)

69.    At the conclusion of that process, SK Foods was left with approximately $9 million in unpaid receivables because the Affiliated Defendants had insufficient capital to repay their obligations.  (March 8, 2010 Declaration of Shondale Seymour, ¶ 90 and live testimony on March 18, 2010.)

70.    According to SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 109), the following transfers of funds or assets, among others, were made by SK Foods to SMC:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 12/31/2008 | $104,621 | Liabilities |
| 2/10/2009 | $82,300 | Liabilities |
| 2/27/2009 | $82,300 | Liabilities |

71.    According to SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 110), the following transfers of funds or assets, among others, appear to have been made by SK Foods to the SSR Trust:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 12/28/2007 | $750,000 | Capital – S. Salyer, Revocable Trust |

| 12/30/2007 | $500,000 | Rent/Lease – Bins/Drums |
|---|---|---|
| 12/28/2008 | $1,000,000 | |
| 4/14/2008 | $500,000 | Capital – S. Salyer, Revocable Trust |
| 4/14/2008 | $100,000 | Capital – S. Salyer, Revocable Trust |
| 4/14/2008 | $50,000 | Capital – S. Salyer, Revocable Trust |
| 6/16/2008 | $210,000 | Capital – S. Salyer, Revocable Trust |
| 9/15/2008 | $240,000 | Capital – S. Salyer, Revocable Trust |
| 12/30/2008 | $250,000 | Accounts Payable – Related Party |
| 12/30/2008 | $225,000 | Accounts Payable – Related Party |
| 12/30/2008 | $650,000 | Capital – S. Salyer, Revocable Trust |

72.    According to SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 111), the following transfers of funds or assets, among others, appear to have been made by SK Foods to SK Frozen Foods:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 6/12/2008 | $292,875 | Accounts Receivable – Related Parties |
| 9/26/2008 | $586,244 | Accounts Payable – Related Party |
| 1/20/2009 | $59,718 | Accounts Receivable – Related Parties |
| 2/25/2009 | $51,628 | Accounts Payable – Related Party |

73.    According to SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 112), the following transfers of funds or assets, among others, appear to have been made by SK Foods to SKPM:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 1/28/2008 | $2,298,396 | I/C CASH – SKPM CORP |

| 11/25/2008 | $126,191 | Accounts Payable – Related Party |
|---|---|---|

74.    According to SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 113), the following transfers of funds or assets, among others, appear to have been made by SK Foods to SS Farms:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 9/3/2007 | $278,924 | CLEARING ACCOUNT |
| 9/3/2007 | $235,880 | CLEARING ACCOUNT |
| 9/3/2007 | $115,026 | CLEARING ACCOUNT |
| 9/4/2007 | $1,103,041 | GROWER FEES WITHHELD |
| 9/4/2007 | $359,061 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/2/2007 | $1,052,333 | GROWER FEES WITHHELD |
| 10/2/2007 | $1,021,887 | GROWER FEES WITHHELD |
| 10/2/2007 | $372,112 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/2/2007 | $360,864 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/12/2007 | $286,531 | CLEARING ACCOUNT |
| 10/12/2007 | $98,913 | CLEARING ACCOUNT |
| 10/16/2007 | $1,119,279 | GROWER FEES WITHHELD |
| 10/16/2007 | $399,587 | RAW MATERIAL INVENTORY - PROCESSED |
| 10/26/2007 | $171,760 | CLEARING ACCOUNT |
| 10/26/2007 | $102,774 | CLEARING ACCOUNT |
| 10/26/2007 | $71,557 | CLEARING ACCOUNT |
| 11/1/2007 | $433,037 | CLEARING ACCOUNT |
| 11/1/2007 | $150,565 | CLEARING ACCOUNT |
| 11/6/2007 | $130,263 | CLEARING ACCOUNT |
| 11/6/2007 | $83,497 | CLEARING ACCOUNT |
| 11/6/2007 | $70,139 | CLEARING ACCOUNT |
| 11/6/2007 | $56,341 | CLEARING ACCOUNT |
| 11/6/2007 | $52,847 | CLEARING ACCOUNT |
| 11/8/2007 | $169,904 | CLEARING ACCOUNT |
| 11/8/2007 | $114,310 | CLEARING ACCOUNT |
| 11/8/2007 | $94,449 | CLEARING ACCOUNT |
| 11/8/2007 | $68,024 | CLEARING ACCOUNT |
| 11/8/2007 | $63,293 | CLEARING ACCOUNT |
| 11/16/2007 | $1,027,111 | GROWER FEES WITHHELD |
| 11/16/2007 | $398,680 | INTEREST EXP PAYABLE AFFILIATED LT |

| 11/16/2007 | $110,953 | RAW MATERIAL INVENTORY - PROCESSED |
|---|---|---|
| 11/16/2007 | $97,861 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $97,686 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $97,104 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $96,383 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $94,244 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $93,318 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $92,861 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $92,029 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $86,231 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $85,066 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $75,744 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $75,692 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $74,148 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $73,321 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $68,608 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $66,159 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $62,425 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $61,795 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $60,099 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $57,500 | RAW MATERIAL INVENTORY - PROCESSED |
| 11/16/2007 | $57,300 | RAW MATERIAL INVENTORY - PROCESSED |

| 11/28/2007[1] | $318,623 | ACCOUNTS PAYABLE - ACCRUED |
|---|---|---|
| 11/28/2007 | $112,213 | ACCOUNTS PAYABLE - ACCRUED |
| 12/14/2007 | $405,078 | RAW MATERIAL INVENTORY - PROCESSED |
| 12/20/2007 | $369,568 | RAW MATERIAL INVENTORY - PROCESSED |
| 1/3/2008 | $1,049,863 | GROWER FEES WITHHELD |
| 1/3/2008 | $884,318 | GROWER FEES WITHHELD |
| 1/3/2008 | $666,470 | GROWER FEES WITHHELD |
| 1/3/2008 | $336,698 | RAW MATERIAL INVENTORY - PROCESSED |
| 1/3/2008 | $285,889 | RAW MATERIAL INVENTORY - PROCESSED |
| 1/15/2008 | $5,428,708 | I/C CASH - SS FARMS |
| 1/31/2008 | $4,000,000 | ACCOUNTS PAYABLE - ACCRUED |
| 3/17/2008 | $550,000 | ACCOUNTS PAYABLE - ACCRUED |
| 3/18/2008 | $225,361 | |
| 3/27/2008 | $100,000 | UNKNOWN |
| 4/1/2008 | $275,000 | UNKNOWN |
| 4/7/2008 | $300,000 | UNKNOWN |
| 4/8/2008 | $191,462 | UNKNOWN |
| 5/9/2008 | $500,000 | paydown  loan -SSF |
| 5/14/2008 | $600,000 | paydown  loan -SSF |
| 5/15/2008 | $200,000 | paydown  loan -SSF |
| 5/28/2008 | $355,764 | paydown ssf note |
| 5/28/2008 | $50,000 | paydown ssf note |
| 6/4/2008 | $300,000 | paydown note SSF |
| 6/6/2008 | $500,000 | ST (90 day) Notes Receivable SSF |
| 6/6/2008 | $180,068 | Notes Payable SSF pay off |
| 7/1/2008 | $191,765 | Notes Payable SSF pay off |
| 8/4/2008 | $1,000,000 | PAYOFF 7/21 SSF LOAN TO SKF $1.5M 8/4 |
| 8/6/2008 | $51,490 | PMT ACCRUED INTEREST SSF 8/6 |
| 8/14/2008 | $1,599,179 | |
| 8/22/2008 | $1,507,034 | |
| 8/28/2008 | $1,557,675 | |
| 9/16/2008 | $1,134,298 | 08WK7HAUL-SKF&CCC90% |
| 9/29/2008 | $2,691,813 | |

[1] The two entries for 11/28/07 are listed on the books of RHM rather than SK Foods.

| | | |
|---|---|---|
| 10/7/2008 | $1,562,493 | |
| 10/14/2008 | $1,500,796 | |
| 10/17/2008 | $1,458,232 | |
| 10/23/2008 | $1,353,144 | |
| 10/24/2008 | $102,636 | |
| 10/28/2008 | $1,054,284 | |
| 10/30/2008 | $85,138 | Grower Payments 11-3-08 |
| 11/4/2008 | $440,434 | 08WK15HAUL-SKF&CCC90% |
| 11/4/2008 | $131,499 | 08WK16HAUL-SKF&CCC90% |
| 11/4/2008 | $81,517 | water purchase |
| 11/5/2008 | $318,840 | Pepper Harvest |
| 11/5/2008 | $163,216 | Pepper Harvest |
| 11/13/2008 | $603,198 | |
| 1/2/2009 | $600,000 | GLV-000006739 |
| 1/12/2009 | $500,000 | ST Advance pymt Rltd Pty SSF |
| 1/14/2009 | $1,500,000 | ST Advance Receipt Rltd Pty SSF |
| 1/14/2009 | $756,000 | ST Advance Receipt Rltd Pty SSF |
| 1/14/2009 | $500,000 | |
| 2/27/2009 | $1,025,000 | Repayment of Short term Borrowings 1mm & 25k |

75.    According to SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 114), the following transfers of funds or assets, among others, appear to have been made by SK Foods to SSC Farming:

| Date | Amount | Description in General Ledger |
|---|---|---|
| 10/18/2007 | $75,000 | Other Long Term Assets |
| 7/24/2008 | $100,000 | Accounts Payable – Related Party |
| 7/25/2008 | $50,000 | Rent/Lease – General |
| 8/7/2008 | $150,000 | Accounts Payable – Related Party |
| 8/20/2008 | $464,866 | Accounts Payable – Growers |
| 10/13/2008 | $77,201 | RAW TOMATOES CONVENTIONAL |
| 10/20/2008 | $85,160 | RAW TOMATOES CONVENTIONAL |
| 11/11/2008 | $316,000 | Accounts Payable – Related Party |

76.    According to SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 115), the following transfers of funds or assets, among others, appear to have been made by SK Foods to the SSC I:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 8/6/2008 | $160,000 | Accounts Payable – Related Party |
| 2/20/2008 | $66,357 | Accounts Payable – Growers |
| 8/26/2008 | $235,813 | Accounts Payable – Growers |
| 9/15/2008 | $65,606 | Accounts Payable – Growers |
| 11/11/2008 | $187,925 | Accounts Payable – Related Party |
| 11/13/2008 | $149,148 | Accounts Payable - Growers |

77.    According to SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 116), the following transfers of funds or assets, among others, appear to have been made by SK Foods to SSC II:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|
| 8/6/2008 | $230,000 | Accounts Payable – Related Party |
| 8/20/2008 | $300,043 | Accounts Payable – Growers |
| 8/26/2008 | $345,685 | Accounts Payable – Growers |
| 10/24/2008 | $99,191 | Accounts Payable – Growers |
| 10/30/2008 | $119,183 | Accounts Payable – Growers |
| 10/30/2008 | $110,318 | Accounts Payable – Growers |
| 11/11/2008 | $161,531 | Accounts Payable – Related Party |
| 11/13/2008 | $325,366 | Accounts Payable -- Growers |

78.    According to SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 117), the following transfers of funds or assets, among others, appear to have been made by SK Foods to SSC III:

| Date | Amount | Description in General Ledger |
|------|--------|-------------------------------|

| 10/14/2008 | $270,696 | Accounts Payable -- Growers |
| 10/30/2008 | $282,620 | Accounts Payable – Growers |
| 11/13/2008 | $833,255 | Accounts Payable -- Growers |

79.    According to the SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 118), the following transfers of funds or assets, among others, appear to have been made by SK Foods to SKF Aviation:

| Date | Amount | Description in General Ledger |
| --- | --- | --- |
| 9/12/2007[2] | $92,608 | Travel services |
| 10/15/2007 | $88,450 | Travel expenses |
| 10/15/2007 | $68,950 | Travel expenses |
| 11/30/2007 | $165,060 | Travel expenses |
| 12/28/2007 | $1,500,000 | Prepaid Services |
| 1/31/2008 | $1,755,651 | Accounts Payable – Accrued |
| 8/6/2008 | $269,000 | Accounts Payable – Related Party |
| 12/30/2008 | $100,000 | Prepaid Services |

80.    According to the SK Foods' books and records (March 8, 2010 Declaration of Shondale Seymour, ¶ 119), the following transfers of funds or assets, among others, appear to have been made by SK Foods to CSSS:

| Date | Amount | Description in General Ledger |
| --- | --- | --- |
| 12/28/2007 | $51,108 | OUT-BOUND FREIGHT EXPENSE |
| 1/15/2008 | $1,590,954 | RAW MATERIAL INV - DRUM LINE |
| 1/15/2008 | $330,138 | CONSTRUCTION IN PROGRESS |
| 5/16/2008 | $104,280 | wired 5/8/08 |

---

[2] This entry is on the books of RHM rather than SK Foods.

| 6/10/2008 | $111,823 | EFT 6/10/08 |
|-----------|----------|-------------|
| 7/3/2008 | $128,542 | EFT 2008185002051 |
| 7/30/2008 | $119,755 | EFT 2008212001082 |
| 8/21/2008 | $60,650 | |
| 9/24/2008 | $51,509 | eft 9/24 |
| 10/1/2008 | $128,352 | |
| 10/10/2008 | $65,634 | |
| 10/27/2008 | $116,596 | |
| 11/6/2008 | $179,336 | |
| 11/21/2008 | $236,031 | |
| 12/12/2008 | $101,682 | |
| 12/29/2008 | $66,430 | |
| 1/27/2009 | $77,096 | Inv cvs2008-149 & cvs2008-142 |
| 4/27/2009 | $54,870 | |
| 5/1/2009 | $151,203 | |

81.    SK Foods and Westlands Water District entered into a Real Estate Purchase and Sale Agreement and Escrow Instructions on October 25, 2005. March 8, 2010 Declaration of Shondale Seymour, ¶61, Exhibit 2. Pursuant to that Agreement, the purchase price was $400.00 per acre, for a total of $1,040,912.00. *Id.*

82.    After October 25, 2005, several amendments were made to this agreement in order to extend the closing date to coincide with the expected issuance of permits from the California Regional Water Quality Review Board. Each such amendment was executed by SK Foods. *Id.*, ¶62, Exhibit 3. The closing ultimately occurred on or about September 13, 2007. At

the closing, title to this property was not transferred to SK Foods. Instead, SSC I and SSC II took title to the various parcels. *Id.*, ¶63, Exhibits 4 and 5.

83.    Debtor never executed any written assignment of this agreement or the rights under it to either SSC I or SSC II.   Neither SSC I nor SSC II paid any consideration to SK Foods in exchange for the purported assignment of Sk Foods' rights. March 8, 2010 Declaration of Shondale Seymour, ¶64. Although SSC I and SSC II furnished the payments, the funds came from Blackstone Ranch Corporation, another Affiliate. March 8, 2010 Declaration of Shondale Seymour, ¶64.

84.    On March 17, 2005, SS Farms entered into an agreement to purchase a parcel of real estate from Elmer and Ronald Tiahrt ("Tiahrt parcel") for $698,725.00. March 8, 2010 Declaration of Shondale Seymour, ¶65.  When the sale closed, the deeds were made out to SSC rather than SS Farms. March 8, 2010 Declaration of Shondale Seymour, ¶65. SK Foods paid for the purchase of this property; SK Foods was never reimbursed. *Id.*, ¶66, Exhibit 6. Another parcel (the Rogers parcel) was purchased by SSC on July 13, 2005 for a total of just over $2.9 million, which included a payment of $1,530,942 at closing. *Id.*, ¶67. SK Foods paid $1.5 million directly to the escrow company just before closing. *Id.*, ¶67, Exhibit 7. The transfers from SK Foods to SSC described above were for the purpose of allowing SSC to purchase these parcels of land. *Id.* ¶¶ 65-67.

## CONCLUSIONS OF LAW

1.    The Court finds that it has jurisdiction over the parties and this dispute.

2.    All Defendants voluntarily appeared in this proceeding, filed opposition papers and introduced evidence, and at no time did the Defendants raise any objection to this Court's jurisdiction or ability to hear the Trustee's motion.  Therefore, any such objections are waived.

3.    At the hearing on the Application for a Temporary Restraining order, the Court found that the Trustee was not entitled to an injunction in the Breach of Fiduciary Duty complaint, and comes to the same conclusion here.  The basis for that conclusion is that the

Trustee's complaint seeks only monetary damages, and does not make a claim for any type of equitable relief. As such, the remedy of a preliminary injunction is not available in that action.

      4.      As a result of that ruling, the Court has not made any findings or conclusions with respect to the evidence presented in support of the Breach of Fiduciary duty claims.

Evidentiary Objections

      5.      The Defendants raised numerous objections to the evidence submitted by the Trustee. Generally, these objections related to a lack of authenticity, foundation and hearsay.

      6.      However, at the preliminary injunction stage, it is often difficult to obtain affidavits from persons who would be competent to testify at trial. For that reason, Courts have discretion to consider evidence that might be inadmissible at the time of a trial upon the merits. As the United States Court of Appeals for the Ninth Circuit has held:

> The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial. 11 C. Wright and A. Miller, Federal Practice and Procedure, Civil, § 2949 at 471 (1973).

*Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. Cal. 1984). *See also Houdini Inc. v. Goody Baskets LLC,* 166 Fed. Appx. 946, 947 (9th Cir. 2006) ("[T]he district court did not abuse its discretion in considering hearsay . . . because the rules of evidence do not strictly apply to preliminary injunction proceedings."); *Republic of Philippines v. Marcos,* 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction.").

      7.      The district courts in this circuit likewise have held that the rules of evidence to not strictly apply to preliminary injunction hearings. For instance, in *Gonzalez v. Wells Fargo Bank*, 2009 U.S. Dist. LEXIS 101036 (N.D. Cal. Oct. 29, 2009) , the Court cited *Flynt Distributing* and *Houdini*, and held that: "Given the evidentiary discretion granted to district courts entertaining a motion for a preliminary injunction, this court accepts the documents

submitted by defendants. In particular, because Gonzalez does not suggest that any of the documents are anything other than what they purport to be, the court sees no reason to presume otherwise. Gonzalez's motion to exclude the documents is DENIED." Similarly, in *Dr. Seuss Ents. v. Penguin Books USA, Inc.*, 924 F. Supp. 1559, 1562 (S.D. Cal. 1996), the Court held as follows: "The exigencies of preliminary relief often prevent the movant from procuring supporting evidence in a form that would meet Rule 56(e)'s requirement of evidence admissible at trial. Such evidence may yet be considered by the court, which has discretion to weigh the evidence as required to reflect its reliability." *See also Puricle, Inc. v. Church & Dwight Co.*, 568 F. Supp.2d 1144, 1147 (C.D. Cal. 2008) (citing *Flynt*, and holding that the "Court may consider inadmissible evidence on a motion for preliminary injunction"); *Rosen Ent. Sys., LP v. Eiger Vision*, 343 F. Supp. 2d 908, 912 (C.D. Cal. 2004) (where Court used its discretion in considering otherwise inadmissible evidence); *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1225 n.4 (C.D. Cal. 2004) (in a preliminary injunction hearing, the Court held: "Rule 901(a) defines a standard of admissibility that is rather general or elastic: the evidence must be 'sufficient to support a finding that the matter in question is what its proponent claims.' Although Plaintiffs are correct that these internet documents are not individually authenticated, the Court finds that at this stage they satisfy Rule 901(a). Moreover, the Court expects that Abercrombie could properly authenticate the materials before trial or summary judgment proceedings.").

8.      The Court finds that the Trustee is not to be held to the same standards of admissibility as in a trial on the merits, and that the Court in its discretion may consider evidence which would be inadmissible at trial. Nevertheless, for much of the evidence, the Trustee has complied with this higher standard for admissibility at trials on the merits.

9.      The Court sustains the Defendants' objections to the use of an Affidavit from Special Agent Artley. The Court will take judicial notice of the fact that an affidavit was filed, but has not considered the contents of that Affidavit.

10.    The Defendants also objected to the use of bank records documenting transfers overseas and emails from Mr. Salyer's email accounts. These objections are overruled.

11.    The documents at issue are Defendants' own documents, and Defendants could easily produce the original documents to verify the authenticity of the exhibits. The documents upon which the Trustee relies are emails from Mr. Salyer's email account and bank records for accounts maintained by the Defendants. Defendants themselves have the documents necessary to ascertain whether the exhibits submitted by the Trustee are authentic. Defendants have not raised any facts to question the authenticity of the documents; rather, they simply seek to put the Trustee to his proof.

12.    The Trustee served Defendants with subpoenas to produce authentic copies of these documents, and the Defendants' failure to produce those documents has prevented the Trustee from providing any further evidence as to authentication. Defendants should not be permitted to demand proof of authenticity, especially at the preliminary injunction stage, when such proof is in their possession.

13.    Because these are Defendants' own documents, they should be required to produce the documents at the hearing or come forward with some reason to suggest that the exhibits are not what they purport to be.

14.    The bank records submitted from Bank of the West (Exhibit W) and Mechanics' Bank (Exhibits JJ, KK and LL) are business records of those institutions, as established in the declarations from their custodians of record. Declaration of Patrick Salcido, Bank of the West (Doc. No. 39) (Exhibit W); Declaration of Annette Bartlett, Mechanics' Bank (Doc. No. 40) (Exhibits JJ, KK and LL).

15.    The email exhibits have sufficient indicia of trustworthiness to satisfy the rules of authentication. Pursuant to Rule 901 of the Federal Rules of Evidence, authentication requires only sufficient evidence so that a jury could find that the matter in question is what its proponent claims. *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006). The distinctive characteristics of the documents themselves may satisfy this standard. F.R.E. 901(b)(4). Emails

may be authenticated in this fashion. *Safavian*, 435 F. Supp. 2d at 40; *United States v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000).  As the 11th Circuit Court of Appeals noted:

> Printouts of email messages ordinarily bear the sender's email address, providing circumstantial evidence that the message was transmitted by the person identified in the email address. . . . Use of the reply function indicates that the reply message was sent to the sender's listed email address.  The contents of the email may help show authentication by revealing details known only to the sender and the person receiving the message.

*Id.* (citing Weinstein on Evidence, ¶900.07[3][c]).

16.     Here, the documents show that Mr. Salyer is the author and recipient of the emails.  They identify the address as fscott.salyer@gmail.com and scott@scottsalyer.net (See Exhibit Y, AA, BB, CC, DD, HH, II).  Other emails demonstrate that the address fscott.salyer@gmail.com belongs to "Scott Salyer" (see Exhibit Z, AA, BB, CC, HH, II).  The text of the emails also refer to meetings with "Mr. Salyer" (Exhibits BB).  Many of the emails refer to the Australian and New Zealand operations, which reference the Foreign Entities (Exhibit Z).  Other emails are from "JJ", which Defendants have conceded was Mr. Salyer's personal assistant, Jeanne Johnston (Exhibit GG).  And some emails specifically reference SK Foods, LP (Exh. II).  Finally, the dates and amounts of the transfers are consistent with those set forth in the bank records (Exhibits JJ, KK, LL).  Therefore, for purposes of this hearing these emails provide sufficient  information necessary to establish that they are what they purport to be: emails to and from Mr. Salyer.

17.     Emails sent by a defendant or his representative or employees are admissions and therefore not hearsay. *Perfect 10, Inc. v. Cybernet Venures, Inc.*, 213 F. Supp. 2d 1146, 1155 (C.D. Cal. 2002).  Alternatively, they qualify as business records. *Lorraine v. Markel American Ins. Company*, 241 F.R.D. 534, 571 (D. Md. 2007); *Rambus Inc. v. Infineon Tech AG*, 348 F. Supp. 2d 698, 706 (E.D. Va. 2004).

18.     In sum, for purposes of this hearing the emails and the bank records are admissible.  Even if this Court were to find that the evidence was insufficient to justify admission at a trial on the merits (which it does not so find), there is more than sufficient

evidence at this stage, and the Court will exercise its discretion to consider those documents, giving them the weight appropriate.

19.    The Defendants have also objected to the testimony of Shondale Seymour as lacking foundation.

20.    The Court allowed the Trustee to present additional foundation through direct examination of Ms. Seymour, who appeared live at the March 18, 2010 hearing at Defendants' request.  After hearing the testimony of Ms. Seymour, including the cross-examination of Ms. Seymour by Defendants' counsel, the Court is satisfied that the Trustee has set forth sufficient foundation for her testimony to be admitted and that she has personal knowledge of the statements made in her March 8, 2010 Declaration.  In particular, the Court notes that Ms. Seymour was Chief Financial Officer of the Debtors as well as a number of the Defendants, had access to all of the records of the Defendants and regularly accessed and reviewed those records as part of her duties.  Ms. Seymour was able to identify the specific source(s) for many of the statements contained in her declarations, and the Court finds her testimony to be credible and persuasive.  Therefore, the Defendants' objections to Ms. Seymour's testimony were overruled.

Requirements for a Preliminary Injunction

21.    A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008).

22.    The likelihood of irreparable harm must be imminent.  *Caribbean Marine Services Co. v. Baldridge,* 844 F.2d 668, 674 (9th Cir. 1988); *Los Angeles Mem'l Coliseum v. Nat'l Football League,* 634 F.2d 1197, 1201 (9th Cir. 1980).  Furthermore, "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Goldie's Bookstore, Inc. v. Superior Court,* 739 F.2d 466, 472 (9th Cir. 1984).  "A plaintiff must

do more than merely allege imminent harm...; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co.*, 844 F.2d at 674.

23.    Here, even without having the benefit of discovery and even having postponed review of documents properly in the Trustee's possession, the Trustee has produced sufficient evidence to support the issuance of a preliminary injunction by establishing the likelihood of success of the merits of his claims.

24.    Based on this evidence, the Trustee has established a likelihood of success on its claim for substantive consolidation, its claims to recover fraudulent and/or preferential transfers, and its quiet title claims.

25.    Substantive consolidation is designed to prevent a debtor from insulating funds and defeating creditors by transferring assets and funds among various interrelated companies. This doctrine was adopted and approved by the United States Court of Appeals for the Ninth Circuit in *In re Bonham*, 229 F.3d 750, 763 (9th Cir. 2000), and has been considered part of the bankruptcy court's general equitable powers since the passage of the Bankruptcy Act of 1898. *See also Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941).

26.    In *Bonham*, the debtor was the sole shareholder and director of two non-debtor corporations. Evidence demonstrated that the debtor had disregarded the integrity of the corporate entities, had comingled assets, and had treated the entities interchangeably. In particular, the debtor had transferred investment income from one corporation to service debt on the other, and used corporate funds toward her own personal finances. The Court of Appeals found that substantive consolidation was appropriate so that the various entities could be viewed as a single debtor with consolidated assets, from which all claims against the consolidated debtors are satisfied. *Id.* at 763.

27.    Substantive consolidation essentially allows a court to pierce the corporate veil of the related entities so that creditors will not be treated inequitably simply as a result of the debtor transferring funds or other assets between the related entities. Indeed, the primary purpose of

substantive consolidation is to "ensure the equitable treatment of all creditors." *Id.* at 764. "Without the check of substantive consolidation, debtors could insulate money through transfers among inter-company shell corporations with impunity." *Id.*

28.    Substantive consolidation is appropriate where "either (1) the creditors dealt with the consolidated entities as if they were the same, or (2) the affairs of the consolidated entities are so entangled that it would not be feasible to identify and allocate all of their assets and liabilities." *Id.* at 771.  Either of the two factors is sufficient to order substantive consolidation. *Id.* at 767.  For the second factor, substantive consolidation is justified where no accurate allocation of assets is possible or where "the time and expenses necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors." *Id.*

29.    Courts have identified a number of factors that are relevant in assessing whether substantive consolidation is appropriate.  These factors include:  (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets or management; (4) thin capitalization, (5) non-observance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away corporate assets by dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud. *See In re Logistics Information Systems, Inc.*, No. 10886-JBR, 2009 Bankr. LEXIS 651 (Bankr. Mass., Mar. 18, 2009).

30.    The facts presented demonstrate a likelihood of success on the merits of this claim.  In particular, the above-recited facts address most of the factors Courts may consider when assessing the propriety of substantive consolidation.

31.    The Court does not expect the Trustee to come forward with expert testimony at this stage of the litigation.  The Court has sufficient evidence to preliminarily evaluate the various factors that weigh on the question of substantive consolidation, and this evidence demonstrates that the Trustee is likely to succeed on the merits of his claims.

32.     As to the claims for fraudulent and/or preferential transfers, the Trustee has similarly demonstrated that he is likely to prevail on the merits.

33.     To prevail under section 548 of the Bankruptcy Code, for example, the Trustee must prove:

- The debtor transferred an interest in property;
- The transfer took place within two years of the filing of the petition;
- And either (1) the transfer was made with actual intent to hinder, delay or defraud creditors or (2) the debtor received less than a reasonable equivalent value in exchange for such transfer and the debtor was insolvent on the date of such transfer.

11 U.S.C. § 548.

34.     SK Foods has presented sufficient evidence of these transfers, the date of the transfers and of the alleged fact that they were made for no or inadequate consideration.  March 8, 2010 Declaration of Shondale Seymour, ¶¶60-85, 109-119; May 11, 2009 Declaration of Paul Forgue, ¶17. SK Foods has similarly presented sufficient evidence that SK Foods was insolvent at the time of these transfers.  March 8, 2010 Declaration of Shondale Seymour, ¶¶98-108.

35.     The Trustee has established a likelihood of success on the merits of those claims.

36.     The Trustee likewise has established a likelihood of success on the merits of his quiet title action.

37.     Some of the real estate in question was purchased with funds from the Debtors.

38.     For other parcels, the Debtors had the rights to acquire those properties but for some unexplained reason, at closing, the properties were titled in the name of the Farming Entities, with no apparent consideration paid for the transfer of those rights.

39.     It is well-settled that irreparable harm consists of harm that cannot be remedied by an award of monetary damages, or an injury that cannot be quantified monetarily. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992).  In the event an injunction is not issued and

Defendants are permitted to transfer or sell their assets beyond the reach of this Court, the Trustee, and the creditors of the estates, will suffer irreparable harm.

40.     The remedy sought in the substantive consolidation litigation is to pool the assets and liabilities of the Defendants with those of the Debtors, so that creditors of all entities will be treated equally.  By selling off the primary assets of these other entities, Salyer and the Defendants are removing any value in these entities.  If these assets are sold or transferred, the Trustee's ability to collect these assets from the purchasers or their assigns (or from overseas accounts) could be compromised.

41.     Similarly, the remedy sought in the fraudulent and preferential transfer claims is the return of the property transferred.  Return of the property is a remedy provided by both federal and California law under these circumstances.  11 U.S.C. §§ 548(a), 550(a); Cal. Civ. Code §§ 3439.04, 3439.05, 3439.07.  If Defendants sell these assets or move them beyond the reach of the Court, then this Court cannot provide the Trustee with the remedy to which he is entitled.  Thus, Courts have held that a preliminary injunction freezing the transfer of assets is proper where fraudulent conveyance is alleged in a bankruptcy case.  *In re Focus Media, Inc.*, 387 F.3d 1077, 1086-87 (9th Cir. 2004).  In such cases, the preliminary relief protects the Court's ability to grant the final relief requested.  *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 501 (4th Cir. 1999).  "A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally."  *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 560-61 (9th Cir. 1992) (internal quotes omitted).

42.     If an injunction is not granted, the assets of the defendants, including the funds that were transferred from Debtors, will be further transferred and the Trustee's ability to recover those funds could be compromised.

43.     If the Defendants are permitted to sell their real estate, the Trustee will have an inadequate remedy in his quiet title action.  The Trustee seeks title to those properties, and if they

36

are transferred to bona fide purchasers, the Trustee's ability to recover those assets may be compromised.

44.     Defendants have shown their willingness to sell assets, even in the face of this Court's orders in the Drum-Line Litigation. Moreover, the Trustee has submitted evidence of transfer of assets to overseas accounts. Prior misconduct in hiding or depleting assets is "extremely relevant to the concern that [defendants] might conceal or dissipate assets" again and is properly considered in granting an injunction. *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

45.     Given the Defendants' past conduct in transferring assets, it is reasonably foreseeable that these entities will continue to do so unless enjoined.

46.     The Trustee has established that he will suffer immediate, irreparable harm if an injunction is not granted.

47.     Because a preliminary injunction is an extraordinary remedy, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter, supra*, 129 S.Ct. at 376 (citing *Amoco, supra*, 480 U.S. at 542). The issue is whether the injury that the defendant will suffer if it is enjoined outweighs the injury that plaintiff will suffer from defendant's conduct if it is not enjoined. *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 284 (4th Cir. 2002).

48.     The harm to the estate if assets are sold is obvious. With respect to the real estate purportedly owned by the Farming Entities, the Debtors have an interest in the property and Defendants are trying to sell that property. With respect to other assets, the Trustee likewise claims an interest in those assets and seeks their return, yet the Defendants are transferring those assets overseas to a variety of countries.

49.     On the other hand, there is little or no harm to the Defendants from the entry of the requested injunction. The language of the Temporary Restraining Order excluded payment of certain limited expenses that are incurred in the ordinary course of business (regular salaries of the sole remaining employee, lease or mortgage payments and utilities), and this exception

continues in the Preliminary Injunction.  If there is a legitimate reason for the Defendants to immediately liquidate their assets, the Defendants may seek permission from this Court.

50.    The balance of harms weighs strongly in favor of granting an injunction.

51.    In deciding whether to grant preliminary injunctive relief, Court must "pay particular regard for the public consequences ...." *Winter, supra*, 129 S.Ct. at 376-77.  The public has an interest in the successful and just resolution of the affairs of a bankrupt debtor.  *See In re PTI Holding Corp.,* 346 B.R. 820, 832-33 (Bankr. D. Nev. 2006); *In re Stadium Management Corp.*, 95 B.R. 264, 269 (Bankr. D. Mass 1988); *In re Monroe Well Service, Inc.*, 67 B.R. 746, 756 (Bankr. E.D. Pa. 1986).  Specifically here, there is a public interest in preserving the assets of the estates of the Debtors for the benefit of its creditors.  Moreover, it is certainly in the public interest to prevent fraudulent transfers of assets for the purpose of avoiding the claims of creditors, especially where the individuals involved have a track record of doing so.

52.    These findings of fact and conclusions of law are to preserve the status quo pending a trial on the Trustee's claims and are not binding at the time of trial on the merits.  Accordingly, the Court may come to different findings and/or conclusions at the trial on the merits.  *University of Texas v. Camenisch*, 451 U.S. 390 (1981); *Horphag Research, Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007).

**CONCLUSION**

In conclusion, the Court finds that the Trustee has demonstrated a likelihood of success on the merits of his claims in the above-captioned adversary proceedings.  The Court further finds that the Trustee has demonstrated a likelihood of immediate, irreparable harm if the requested relief is not granted.  The Court further finds that no other remedies would provide appropriate relief.  The Court further finds that the balance of equities weighs in favor of granting an injunction and that an injunction is in the public interest.  For the foregoing reasons,

1   the Court finds that good cause exists for entry of a Preliminary Injunction in for form entered by

2   the Court on March 20, 2010.

3

4   Dated:    APR – 5 2010

5

6                                        By: *Robert Bardwil*

7                                             ROBERT S. BARDWIL
                                              UNITED STATES BANKRUPTCY JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF MAILING

I, Andrea Lovgren, in the performance of my duties as Deputy Clerk to the Honorable Robert S. Bardwil, mailed by ordinary mail a true copy of the attached document to each of the parties listed below:

Gregory Nuti
Schnader Harrison Segal & Lewis
One Montgomery Street, Suite 2200
San Francisco, CA 94104- 5501

Thomas Phinney
Parkinson Phinney
400 Capitol Mall, 11th Floor
Sacramento, CA 95814

Malcolm Segal
James Mayo
Segal & Kirby, LLP
770 L Street, 1440
Sacramento, CA 95814

Larry Lichtenneger
Lichtenegger Law Office
3850 Rio Road, #58
Carmel, CA 93923

Paul Pascuzzi
Felderstein Fitzgerald
   Willoughby & Pascuzzi
400 Capitol Mall, Suite 1450
Sacramento, CA 95814

DATE: April 5, 2010

_____
Deputy Clerk